[No. S031247. Dec. 9, 1996.]

In re JOHN LOUIS VISCIOTTI on Habeas Corpus.

COUNSEL

Timothy J. Foley, Goldfein, Schwartzberg & Stark and Richard Schwartzberg for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pat Zaharopoulous, William M. Wood and John T. Swan, Deputy Attorneys General, for Respondent.

OPINION

BAXTER, J.—Petitioner John Louis Visciotti was convicted by a jury in the Orange County Superior Court of first degree murder of Timothy Dykstra with a robbery special circumstance (Pen. Code, §§ 189, 190.2, subd. (a)(17)(i)), attempted murder of Michael Wolbert (Pen. Code, §§ 664/187),[1] and robbery of both men (§ 211). The jury also found that he had personally used a firearm in the commission of the offenses (§ 12022.5) and that he intended to kill the murder victim, Timothy Dykstra. The same jury determined that petitioner should be sentenced to death. This court affirmed the judgment in its entirety. (*People* v. *Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

In a subsequently filed petition for writ of habeas corpus, petitioner asserts ineffective assistance of counsel, relying on both the record of the trial and evidence outside the record. This court issued an order to show cause limited to the issue of ineffective assistance of counsel at the penalty phase of the trial. In so doing we implicitly concluded that allegations that petitioner received prejudicially ineffective assistance of counsel at the guilt phase and was denied the right to trial before an impartial tribunal failed to state a prima facie case. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 119, fn. 37 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 362-363 [233 Cal.Rptr. 368, 729 P.2d 802].)

After the filing of respondent's return and petitioner's traverse, we determined that disputed facts necessitated an evidentiary hearing. (See *People* v. *Romero* (1994) 8 Cal.4th 728, 737-740 [35 Cal.Rptr.2d 270, 883 P.2d 388]; *In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257].) The Honorable Eileen C. Moore, Judge of the Orange County Superior Court, was appointed referee with directions to take evidence and make findings of fact on the several questions that will be discussed below.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

After an independent review of the appellate record and record of the evidentiary hearing, we conclude that, assuming petitioner's trial counsel afforded inadequate representation in some respects, petitioner has not demonstrated that those failings were prejudicial. Because he has not established that absent those failings it is probable that a more favorable result would have been reached by the penalty jury, he is not entitled to relief. We shall, therefore, discharge the order to show cause and deny the petition for writ of habeas corpus.

## I

### Background

The events leading to the murder conviction and imposition of the death penalty are set forth in *People* v. *Visciotti, supra,* 2 Cal.4th 1. Briefly, petitioner and Brian Hefner, who had been employed as salesmen by a company which also employed victims Timothy Dykstra and Michael Wolbert, lured the victims to a remote area of the Anaheim Hills on Santiago Canyon Road in Orange County in a preplanned robbery scheme. There the victims were robbed, shot, and abandoned. Dykstra died at the scene. Wolbert survived, notwithstanding bullet wounds in the torso and face, and testified against petitioner whom he identified as the shooter.

Wolbert described petitioner's methodical execution of Dykstra and attempt to murder Wolbert. Petitioner directed Wolbert, in whose car the four were driving, to the site where the crimes were committed. Before leaving with petitioner and Hefner, Wolbert and Dykstra had hidden the pay they had just received behind the dashboard of Wolbert's car. Petitioner asked Wolbert to stop, claiming a need to relieve himself. Dykstra got out to let petitioner out of the backseat. Hefner followed. At that point Wolbert saw a gun in petitioner's waistband. Wolbert left the car also and saw petitioner pointing the gun at Dykstra. The pair were face to face, less than two feet from each other, next to the passenger side of the car.

As Wolbert walked to the back of the car he ran into Hefner, who said "he's not fucking around." Petitioner then demanded the victims' wallets and threatened Dykstra. Dykstra and Wolbert sat on an embankment at the side of the road, Dykstra near the front of the car, Wolbert a few feet behind the car. Wolbert told Hefner where the money was hidden. Hefner went to the car and returned with the money. Wolbert asked petitioner to take the car and the money, but to let him and Dykstra go, promising not to identify petitioner. While Hefner was in the car, petitioner had moved closer to Wolbert, but when Hefner returned petitioner moved back to the location at

which Dykstra was seated, raised the gun, and shot and killed Dykstra. Wolbert arose and took several steps back as petitioner approached him with the gun. Petitioner raised the gun, holding it with two hands extended out from his chest, and shot Wolbert. The first shot was from a distance of about six feet. It hit Wolbert in the rib cage. Wolbert fell. As Wolbert lay on the ground and looked at petitioner, petitioner stepped closer to Wolbert. Standing at Wolbert's feet, about three feet from him, petitioner raised the gun and shot Wolbert again. This shot hit Wolbert in the left shoulder. When petitioner began to walk away, Wolbert got up. Petitioner turned as Wolbert approached, and from a distance of two feet put the gun to Wolbert's head and shot him again. This shot hit Wolbert in the left eye. Petitioner and Hefner then abandoned the victims, taking Wolbert's car, and fled the crime scene. Each time petitioner fired the gun he had to pull the hammer back to manually cock it.

Petitioner and Hefner, who was separately tried and sentenced to life imprisonment without possibility of parole, were quickly apprehended. Petitioner confessed and participated in a videotaped reenactment of the crime.

The defense presented evidence at trial that petitioner had learning disorders attributed to a minimal brain injury, had ingested drugs prior to the crimes, was not completely aware of his actions during the offenses, and was unable to judge the nature and consequences of his actions. Evidence of petitioner's history of drug and alcohol abuse was also presented in support of an expert's conclusion that petitioner was in a drug-induced psychotic state at the time of the murder and attempted murder.

The defense offered mitigating evidence at the penalty phase in testimony by petitioner's parents, siblings, and girlfriend about petitioner's love and concern for his family, his helpfulness, and his musical and artistic talent. The family members testified that petitioner's personality changed when he was under the influence of drugs, and his father testified about his efforts to persuade petitioner to cease using drugs—efforts that included "punching" petitioner across the room, and bribing him. The penalty phase argument by defense counsel Roger Agajanian was, as we described it in the decision on appeal "a rambling discourse, not tied to particular evidence" (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 82, fn. 45) during which counsel asked the jury to spare petitioner's life because he was the only bad child of a loving family that would suffer if petitioner were to be executed.

## II

### *The Ineffective Assistance of Counsel Claim*

The claim on which the order to show cause issued is petitioner's assertion that he received constitutionally ineffective assistance of his counsel,

Roger Agajanian, at the penalty phase of the trial. In a related claim that we deem part of the ineffective assistance of counsel claim, petitioner alleges that counsel labored under a conflict of interest which affected counsel's ability to forcefully and competently represent him. We decline petitioner's request that we reconsider our conclusion that his other claims do not state a prima facie case for relief.

Petitioner's allegations in support of his claim of constitutionally inadequate representation by trial counsel extend to counsel's preparation for and performance at the penalty phase of the trial. He attributes counsel's tactical decisions and deficient performance at this stage to both incompetence and the assertedly prejudicial impact of a conflict of interest.

Allegedly counsel labored under a conflict of interest that existed because of financial arrangements between counsel and petitioner's family, who retained Agajanian, agreeing to pay $25,000 for representation at trial and to pay for experts and investigation. Petitioner claims the family paid only $5,000 to $7,500. Agajanian did not seek public funds for investigation or experts, although petitioner was indigent, apparently believing that such funds were not available when a defendant has retained counsel.

Petitioner also alleges that Agajanian's investigator, Grasso, performed only "minimal tasks," including a visit to the scene of the offenses, group interviews with family members, and one interview with petitioner's girlfriend. Petitioner alleges that no other investigation was undertaken, no records obtained, and no nonfamily witnesses were interviewed. He also alleges that counsel did not act competently in interviewing the witnesses and in inspecting the physical evidence, and did not prepare properly for trial. Counsel did not ensure that his expert, Dr. Louis Broussard, was adequately prepared, with the result that Dr. Broussard did not have access to crucial information and was not given important evidence. Dr. Broussard interviewed petitioner only once and, allegedly, did not conduct a meaningful examination of petitioner.

At the penalty phase counsel's theory was to invoke jury sympathy for petitioner's family.

Petitioner alleges that counsel's failings at the penalty phase are attributable in part to the conflict of interest which arose because counsel could not "bite the hand that feeds him." Agajanian was dependent on the family to pay the unpaid balance of his fee. Petitioner claims that, as a result of the

conflict, counsel did not present available evidence that, far from being a child of a loving family, petitioner was raised in a dysfunctional family in which both physical and psychological abuse were inflicted on petitioner by his parents. Petitioner implies that counsel was concerned that if evidence of this mistreatment were presented the remaining fee would not be paid.

Incorporating all of the above allegations of inadequate representation by trial counsel at the guilt phase into his assertion of penalty phase incompetence, petitioner alleges that trial counsel failed to offer a viable penalty phase defense, failed to make appropriate objections and motions, and stipulated to an improper response to a jury inquiry. Allegedly, counsel failed to investigate and attack or impeach aggravating evidence and witnesses. He did not take the advice given, or undertake the steps recommended, by Dr. Kaushal K. Sharma, a forensic psychiatrist, which steps were necessary to adequate penalty phase representation. Instead, he presented an allegedly "inadequately developed, ill-conceived and ineffective" theory of invoking sympathy for petitioner's family, gave a rambling argument not tied to any evidence, and mistakenly argued that impaired mental state, a mitigating factor, was not present. Moreover, counsel did not request a limiting instruction regarding consideration of the evidence of past arrests and criminal conduct so as to reduce the prejudicial impact of "inadmissible" evidence; did not sufficiently object and make an offer of proof to support a continuance to prepare to rebut the testimony regarding a 1978 knife assault on Kathy Cusack; did not object to the testimony of William Scofield about that assault; stipulated to what he claims was an incomplete and prejudicial response by the court to juror questions regarding the mitigating factors of extreme duress and moral justification; did not object to instructions permitting the jury to consider nonviolent conduct in aggravation; and did not object or seek admonishment regarding allegedly improper penalty phase argument which included reference to possible unproved escapes, personal insights and background of the prosecutor, excuses for "distasteful" prosecution witnesses, a suggestion that "phantom" mitigating evidence could be considered aggravating, a misleading assertion that coperpetrator Hefner had no criminal record, a misleading argument that petitioner was the "bad seed" in a "nice" family, use of age as an aggravating factor, and portrayal of the sentencing process as a mechanical mandatory weighing process.

Petitioner's principal claim is, however, that counsel failed to investigate, discover, and use mitigating evidence regarding petitioner's upbringing in conditions which, he claims, would have explained to the jury his resort to drugs and alcohol and, ultimately, to these offenses. He alleges that his family was not supportive and loving, that his parents engaged in interspousal conflict, physical battering, verbal abuse, labeling and mistreatment.

Petitioner was the fifth child. He was born with severe club feet which required that he wear splints and braces for three years. He was stigmatized and isolated as a result. His condition caused severe financial problems and stress in the family.

The family moved at least 20 times by the time petitioner was 16 years old. This disrupted and undermined his education and social development, and contributed to feelings of insecurity and low self-esteem. When petitioner was 13, a potential seizure disorder was diagnosed and brain damage was suspected as a cause of his problems. He first experimented with drugs in grammar school when his father abandoned the family. During adolescence petitioner experimented with a wide variety of street drugs. His long-term drug use affected his ability to concentrate and impaired his mental functions.

Petitioner allegedly suffers from a mild neuropsychological impairment and has a significant discrepancy between verbal and nonverbal memory. He has mild motor function deficits and difficulty in complex/abstract thinking. In the structured environment of juvenile camp his behavior improved. Notwithstanding his problems, he was capable of and performed altruistic acts of sincere kindness.

Petitioner contends that this, and other mitigating evidence would have demonstrated that the evidence offered by the prosecution was inaccurate and misleading. The prosecution evidence could have been impeached and its impact diminished.

Our issuance of an order to show cause on these allegations reflected a preliminary determination that, if true, they stated a prima facie case for relief. (*In re Hochberg* (1970) 2 Cal.3d 870, 876, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1].)

The Director of Corrections filed a return to the order to show cause accompanied by a declaration by trial counsel Roger Agajanian in which trial counsel states that while he had extensive contact and conversations with members of petitioner's family, there was no mention of petitioner having been abused by his parents, of his childhood deformity, or of a dysfunctional family environment. Counsel declared that even had he known of petitioner's family background and the abuse he would not have presented the evidence. It was his opinion that any attempt to gain sympathy for petitioner would have failed. Had he presented the evidence, he could not have had petitioner's parents present at the trial and would have given the jury the impression that petitioner's family had abandoned him. His strategy

of garnering sympathy for family members had been successful in prior murder cases in which the jury returned not guilty verdicts. He did not follow up with the two court-appointed experts, as their testimony would not have been consistent with that of counsel's own expert regarding petitioner's mental state at the time of the offense. Counsel said his ignorance that petitioner had stabbed Kathy Cusack during the 1978 assault on Scofield was due to petitioner's failure to tell him about Cusack.

After reviewing the return and petitioner's traverse, we concluded that it would be necessary to resolve several disputed factual matters in order to determine whether petitioner is entitled to relief. The referee was therefore ordered to take evidence on and make findings of fact on the following questions, the relevance of which to petitioner's claims will be explained below:

1.　Did trial counsel Roger Agajanian interview members of defendant's family and/or family friends, and, if so, what information did he obtain from them which did or should have alerted him to the existence of potentially mitigating penalty phase evidence?

2.　Did trial counsel conduct any other investigation of penalty phase defenses or become aware of potentially mitigating evidence from any other source?

3.　Did the court-appointed psychiatric experts, Dr. Kaushal K. Sharma and Dr. Seawright Anderson, view any postarrest videotape of petitioner; did trial counsel review reports by those experts regarding defendant's mental condition; and did counsel receive and respond to the requests made by Dr. Kaushal K. Sharma on May 8, 1983, and May 31, 1983, for additional background information regarding defendant?

4.　What was the content of the report to the court by Dr. Seawright Anderson?

5.　In preparation for trial did trial counsel review any medical and/or psychiatric/psychological records; school records; juvenile court records; or other materials relevant to defendant's history?

6.　Was trial counsel's decision to forego presentation at the penalty phase of evidence regarding defendant's childhood and adolescence an informed and knowledgeable decision?

7.　Was trial counsel's penalty phase strategy affected in any way by the fee arrangement between counsel and defendant's parents?

## III

### *Evidence Received at the Hearing Before the Referee*

Petitioner presented evidence to support the factual allegations of the petition related to trial counsel's lack of preparation and investigation of potentially mitigating evidence. He also presented evidence to support his claim that mitigating evidence was available. That evidence, discussed in greater detail below, included the testimony of family members and friends regarding the discordant atmosphere in the Visciotti family home created by an unending series of physical and verbal confrontations between petitioner's parents; physical punishment of petitioner and his siblings; threats of violence; impermanence caused by the family's numerous moves and its impact on school attendance and the ability to make lasting friendships; the children's efforts to escape the household turmoil by hiding, leaving the house, early marriage, and resort to drugs as "self-medication." Social workers, psychologists, and other witnesses testified regarding the impact of these events on petitioner's development and ability to function in society.

Petitioner's theory is that all of this evidence might have been presented to the jury had counsel discovered it and elected a penalty phase tactic other than an attempt to elicit sympathy for petitioner's family—the "family sympathy" defense. The evidence offered at the evidentiary hearing regarding trial counsel's lack of preparation and investigation was uncontradicted. The recollections of family members regarding some occurrences during petitioner's childhood differed in some respects, but the evidence that the family life was chaotic and that petitioner suffered parental verbal abuse throughout his childhood was uncontradicted. The evidence offered at the hearing before the referee is summarized below.

### A. *Trial counsel's investigation and preparation for penalty phase trial.*

Roger Agajanian was admitted to the bar in this state in July 1973. He had never tried a capital case that went to the jury before the Visciotti case, and had never conducted a penalty phase trial. He had tried several murder cases between 1981 and 1983, however. He decided prior to jury selection in the Visciotti trial, when he saw petitioner's videotaped reenactment of the murder, that he would attempt to elicit sympathy for petitioner's family as his penalty phase strategy. He believed that, although sympathy for petitioner could not be expected, sympathy for petitioner's parents might be. His defense would therefore suggest that the parents were nice people whose son should not be killed.

Evidence was also presented that when he made that decision Agajanian had never represented a client at the penalty phase of a capital case and in

none of his self-described successful presentations of a family sympathy defense in prior cases was family sympathy evidence relevant to any issue in the case and in none could the effort be accurately described as "success-ful."[2] The other basis for counsel's hope that family sympathy might sway the jury was his belief that, in a widely reported case in which Agajanian had no involvement, a jury acquitted the defendant of a narcotics-related charge and in doing so was influenced to accept an entrapment defense by the loyalty displayed by the defendant's wife who was regularly in attendance at the trial.[3]

Agajanian testified that he did not conduct formal interviews with any members of petitioner's family in preparation for the penalty phase. He did no investigation and did not have a social worker or investigator do any investigation to seek potentially mitigating evidence. He conceded that when he made his decision regarding trial of the penalty phase he had no infor-mation about petitioner's background other than what appeared to him to be "good aspects" of the family. The decision that no effort would be made to pursue a sympathy defense based on petitioner himself was made without knowing what other evidence for a defense he might find if an investigation was pursued. While he was aware that petitioner had abused drugs, he had never had a jury return a favorable verdict when the defense was based on drug use.

Agajanian testified that he had no information about petitioner's family when he made his decision on penalty phase tactics. That testimony was contradicted by his expert, Dr. Louis Broussard, who testified that Agajanian told him that there was some "brutality" in the family. Dr. Broussard also testified that Agajanian had explained the limited scope of the examination Broussard was asked to perform and report on was appropriate because the "DeLorean case" had convinced Agajanian that a jury was less likely to convict if there was substantial family support.

At the request of Agajanian, the trial court appointed two experts in the mental health field, but only to assess petitioner's competence to stand trial and sanity at the time of the offenses. Neither testified at the trial. Both testified at the evidentiary hearing.

---

[2] In one of the four cases in which counsel claimed to have relied successfully on eliciting juror sympathy for the family of the defendant, there were no jurors. In another, the defendant was convicted as charged.

[3] The court has not considered whether family sympathy is within any statutory factor (§ 190.3) or an aspect of the defendant's character or record which the jury must be allowed to consider. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 844 [281 Cal.Rptr. 90, 809 P.2d 865].) Inasmuch as we assume arguendo that petitioner's trial counsel's decision to rely on this penalty phase strategy was not competently made, we need not do so here.

Dr. Seawright Anderson, a psychiatrist who had been appointed in approximately 25 capital cases prior to his appointment in the Visciotti case, testified that in such appointments defense counsel usually contacts him to advise him of the things in which the attorney is particularly interested. It is his practice to await such contacts until the attorney provides him with the arrest report and background information which the court does not provide. His staff contacts the attorney if the attorney has not already provided the information needed.

Dr. Anderson was appointed to evaluate petitioner only under sections 1026 and 1368, i.e., to determine if petitioner was sane at the time the offenses were committed and whether he was competent to stand trial. In evaluating petitioner, Dr. Anderson read the arrest report and documents from the Youth Authority and Department of Corrections compiled at the time of petitioner's prior commitment after conviction of assault with a deadly weapon. His staff obtained those documents for him from Agajanian's office. He reviewed no other documents. The notes of his office manager indicated that Agajanian wanted Dr. Anderson to consider petitioner's drug history, his prolonged use of cocaine, and the "new diminished capacity." Dr. Anderson did not review the videotaped reenactment of the offense or the videotape of petitioner confessing to the crimes. He was provided with no previous drug history, no probation reports, and no psychological reports from the Youth Authority or Department of Corrections.

Dr. Anderson interviewed petitioner for slightly over one hour. He did not administer any psychological tests, although they would have been useful if diminished capacity were in issue. They were not necessary to determine sanity and competence. Dr. Anderson recommended that an electroencephalogram (EEG) and computer assisted tomography (CAT) scan be administered to rule out the possibility of organic brain disorder, as petitioner had a history of head injury and prolonged substance abuse. He would have assisted Agajanian in arranging for those tests, but was not asked to do so. Once his report was sent to Agajanian, he heard nothing more about the case.

During the interview with Dr. Anderson, petitioner did not state that he had been mistreated by his parents. Dr. Anderson testified that it is not unusual for a patient to omit this as such reference brings up uncomfortable feelings and the patient is depressed. In Dr. Anderson's experience it is not unusual for a patient to minimize abuse, especially when it is inflicted by the patient's parents.

In his report, Dr. Anderson concluded that petitioner was competent to stand trial and was sane at the time of the offense. He also reported,

however, that as a result of prolonged drug abuse and paranoid ideation, petitioner suffered from diminished capacity at the time the charged offense was committed and was unable to meaningfully and maturely reflect on the gravity of the contemplated acts. He also concluded that petitioner was addicted to cocaine, amphetamines, and marijuana, and recommended that an EEG and a CAT scan be performed to rule out the possibility of organic brain disorder, and that psychological tests be administered to obtain more information about petitioner's basic personality structure.

Dr. Kaushal K. Sharma, a forensic psychiatrist, was the second expert appointed by the court. Agajanian did not supply him with any background information regarding petitioner and did not reply to a letter asking for that information. Dr. Sharma went personally to Agajanian's office and obtained some documents. He never spoke with Agajanian. He examined petitioner and, on July 19, 1993, wrote to Agajanian stating that he had not detected any psychiatric impairment. The letter explained, however, that the statement was based on a very limited interview and a rather superficial examination of the documents supplied to him. The letter was not intended to be a report. Instead it was a means of closing Dr. Sharma's file because he did not have the time or patience to continue "bugging" Agajanian for the information he had requested from him.

Based on these reports, Agajanian concluded that neither of these experts would be helpful to the defense. He therefore contacted Dr. Louis Broussard, a psychologist who had undertaken examinations for him in approximately twenty prior cases, two or three times under appointment, and had testified for Agajanian two or three times. Dr. Broussard testified that Agajanian often contacted him after a case was already in trial in order to deprive the prosecution of access to his reports.

In the Visciotti case, Agajanian told Broussard only that he wanted testing and findings, and that it was a murder trial. Dr. Broussard spent no more than one hour with Agajanian and did receive some information about "brutality" in the family from Agajanian, but he did not receive any social or family history. They did discuss diminished capacity. Agajanian was aware that the defense had been abolished, but Agajanian believed that evidence of diminished capacity could come in nonetheless and "the jury could make up its mind."

Dr. Broussard's testing and interview took no more than two and one-half hours. It was performed on July 22, 1983, two days after the People rested in

the guilt phase of the trial.[4] He did not obtain a comprehensive social history from petitioner, and told Agajanian that he should obtain a licensed clinical social worker to do that. His interview was only to find out what happened when the crimes were committed and to ascertain why from the defendant's point of view. He did not obtain a drug history as the defendant was "a little bit out of it" on that day and was not terribly responsive. Dr. Broussard first explained his failure to attempt a further interview with defendant on the basis that he had the information he needed for his report and did not think he would obtain more information in a further interview because, based on the tests he had administered, he believed that the defendant was then operating at his capacity. He later testified that the reason he did not see the defendant again and perform additional tests was the time problem. He was hired late in the case and was told that he would testify in the week after he first saw Agajanian about the case. Agajanian said that Dr. Broussard had advised Agajanian that it was a very serious case and would require comprehensive investigation and that the cost of those investigations would be approximately $2,500, which Agajanian was not willing to take the time for or to pay for.

Dr. Broussard testified that his focus was limited to guilt phase considerations. Agajanian did not want more than present psychological factors to be considered, as his strategy was to show family solidarity. He did not want an opinion on childhood abuse in the report or for Dr. Broussard to indicate that there was any problem in the family, no matter how important information about the family was.

Additional lack of preparation for the penalty phase of the trial was offered in evidence that Agajanian did not review the prosecutor's file. Although it was the practice of the district attorney at the time of the Visciotti trial to make the case files of prosecutors available to defense counsel, Agajanian was not aware that during petitioner's 1978 assault with a deadly weapon on William Scofield, petitioner had also repeatedly stabbed Kathy Cusack who was pregnant. Agajanian did not send for the police report or go through the prosecutor's file to read it in advance of trial and thus was surprised and unprepared to face that evidence. He stated that he had not seen the report and was not aware of the Cusack incident because petitioner lied to him.

Agajanian testified that at the time of trial petitioner's father, Luigi Visciotti, had paid only a fraction of the $25,000 fee, and that over the

[4]Agajanian explained his delay in contacting Dr. Broussard by stating that he planned to use the expert only at the penalty phase. In fact, Dr. Broussard testified only at the guilt phase.

course of the representation Luigi had paid a total of approximately $5,000 and done some tile work for Agajanian because he had no more money. Agajanian believed he was owed about $15,000. Luigi testified that a boyfriend of his daughter Ida had given Agajanian a $17,000 lien on the friend's anticipated accident settlement. Luigi believed that he owed Agajanian $7,000 when the trial began and had paid off the debt with tile work, tree trimming, and cleanup work.

### B. *Undiscovered mitigating evidence.*

The evidence that counsel did not discover and present consisted principally of the social, medical, and family history of petitioner. One of petitioner's experts, Shirley Reece, a licensed clinical social worker and professor at the University of California at San Francisco, prepared a social history of petitioner. She described that history as offering "overwhelming mitigating circumstances" in "an absolutely horrendous family history." The family and social history came from hospital, school, probation, Youth Authority, and Department of Corrections records and from information supplied by close family members.

Professor Reece testified that the interaction between petitioner's parents was extremely volatile, hostile, and mutually abusive, both physically and verbally. Without exception the children described the family as chaotic, stating that they lived a life of terror. They were always frightened and often worried that the parents would kill each other. Petitioner's father continually berated him, called him stupid and retarded, and threatened to break his legs. The children were blamed for the family's difficulties, and some were beaten with a belt and slapped. Economic problems and the number of children caused the family to move often which had a profound effect on the children. Petitioner left kindergarten after nine days and was not re-enrolled in school for the first grade for two years. The overall record of school attendance and withdrawal was appalling and destructive to petitioner's development. That family situation, petitioner's short stature, and the epithets used by his father which petitioner "internalized" and began to believe were true, led to a person who was markedly lacking in self-esteem and depressed. He thought he could never do anything right and could never do anything to please his parents. He was highly self-critical and blamed himself for things for which he had no responsibility such as his parents' difficulties. He had suicidal ideation and had nowhere to turn other than drugs for a way out.[5]

Jay Jackman, M.D., an expert in forensic psychiatry with extensive experience in substance abuse cases, reviewed the same background information.

---

[5]Professor Reece interviewed petitioner's parents, who engaged in a heated argument during the interview. She described the event as "quite extraordinary," testifying that the

Prior to his testimony, he had reviewed declarations by members of petitioner's family, the trial testimony of petitioner, the videotapes in which petitioner reenacted the crime and was interviewed by police, as well as numerous other medical, Department of Corrections, Youth Authority, probation, and school records related to petitioner, all of which were available and could have been discovered by Agajanian with reasonable investigation. Dr. Jackman examined petitioner twice.

In the opinion of Dr. Jackman, it is necessary to spend a minimum of 15 to 20 hours interviewing a capital defendant. That time is particularly important in cases of childhood abuse because it is necessary to develop a relationship of trust. Persons with a history of abuse are extraordinarily protective of their families. They are defensive about their own abuse history and are very reluctant to talk about it. He was able to spend only about 10 hours in interviews with petitioner because of time and monetary constraints, but if he were testifying before a jury he would do a longer workup.

Petitioner was born with club feet, a moderately severe congenital abnormality. Dr. Jackman testified that this had a very negative effect on both petitioner and his family. Treatment for the condition was expensive and strained the resources of the family. Petitioner's mother, Catherine, never worked outside the home and his father, Luigi, was a marginal wage earner. Corrective treatment prevented petitioner from walking until he was three years old and required first Dennis Brown splints and then special shoes which the family could not afford without help from petitioner's grandparents, a factor that impacted on his father's self-image. Luigi "took it out" on the children and, in particular, on petitioner whom he resented. He used threats to break petitioner's legs to terrorize him, saying he had paid to have the legs fixed and would break them again. Although petitioner had no memory of the condition and treatment, Dr. Jackman believed that the birth handicap had a colossal and devastating effect on petitioner's self-image because from his earliest self-awareness, he was aware that he was different from other children. The result was feelings of inadequacy, incompetence, inferiority, worthlessness and low self-esteem.

Petitioner told Dr. Jackman that he began to experiment with drugs at age eight when he was exposed to marijuana, apparently by boyfriends of his sisters. The materials supplied to Dr. Jackman and the declarations from family members described the Visciotti home at that time, and throughout petitioner's childhood, as chaotic, a battle zone, hostile and nasty, where the parents continuously verbally and physically abused each other and the

---

parents shouted and menaced one another to the point that a staff member came from another room to ask if they could "tone it down."

children. There were no expressions of love between the parents or from the parents to the children. Petitioner's parents called him an "asshole," a "mother fucker," "stupid," and "retarded." His father told him he would never amount to anything and subjected him to a series of devaluing comments.

The family moved at least 20 times while the children were growing up. The children changed schools often, were never up with their classes, and had few friends in school. As a result most of the children disliked school and attended sporadically. The constant moves impacted petitioner's ability to function in school and in his social world. He was always an outsider.

The battles between petitioner's parents involved screaming that could be heard more than a block away. His mother threw objects at his father. The fighting was so intense that the children feared that their parents would kill each other. When they were young, the children hid in their bedrooms or closets when the fights occurred. When older, they left the house. Petitioner's older sisters married in their midteens, in part to escape the home environment. Only three of the children remained in school to graduate from high school. On three occasions, petitioner's father abandoned the family and moved in with women friends.

Petitioner's first use of drugs coincided with the birth of his younger brother, Tony, one of the occasions on which his father abandoned the family.

Petitioner's reaction to his parents' battles was to hide in a dark place. He also found hiding places in abandoned cars where he could spend time away from the home situation.

While in Youth Authority custody and away from the family, petitioner's behavior and his schooling improved markedly. He was not a behavior problem and did all jobs expected of him. Staff members believed that he was not a typical delinquent and had him tested for a brain abnormality. An EEG was abnormal and suggested a seizure disorder so Dilantin was prescribed. While taking the medication petitioner did not abuse drugs and his behavior was significantly improved. He was not considered by Youth Authority staff to be a drug abuse problem. Notwithstanding the family situation, petitioner always expressed a desire to go home when in Youth Authority custody. Youth Authority staff noted, however, that what appeared to be a close-knit family was at the point of falling apart, a problem that terrified petitioner to the point that he stuttered when he talked about it. Whenever petitioner was released to the family's disorganized psychological

environment, which Dr. Jackman termed a "toxic" environment, the negative behavior and drug abuse returned. Dr. Jackman testified that it was not unusual for an abused child to still love and feel attached to the parents.

Dr. Jackman believed that until petitioner was eight his method of escaping the family situation was physical—he absented himself from the home. Later, drugs afforded him an alternative means of escape. Between the ages of eight and twelve petitioner used alcohol and Seconal, a sedative hypnotic. The drug relieved a psychotic mood, a painful, unpleasant mood state caused by the family situation, and made him feel "mellow." Dr. Jackman described this drug use as a self-medication pattern often seen in children who use self-medication to control the undesired, unpleasant moods they have, changing drugs as their mood changes.

In his early teens, petitioner began to use amphetamines, preferentially "uppers" to overcome depression, as the "downers" he had used before no longer had the desired effect. At that time he was doing very poorly in school and missed as many days as he attended. He had no social relationships and was what Dr. Jackman described as "basically a depressed kid." At 15 petitioner began using cocaine which became his drug of choice by the time he was 18. In his later teens, petitioner also used what petitioner described as "cannabis," but which Dr. Jackman testified was actually phencyclidine or PCP, a drug that distances people from their experience so that they become dispassionate observers of what goes on in their world. This drug enabled petitioner to see and participate in the family but not feel what went on emotionally. Most of the criminal conduct in which petitioner engaged occurred during a period when he had progressed to injecting PCP intravenously several times a day in order to have that detached experience.

Dr. Jackman believed that petitioner's criminal behavior was directly related to his drug use. The behavior was impulsive. Petitioner was not a criminal or antisocial personality. He had a number of "prosocial" behaviors which Dr. Jackman had not seen in antisocial personalities who were killers.

Additional potentially mitigating evidence of which counsel had no knowledge was offered in the testimony of family members whose declarations had been reviewed by Professor Reece and Dr. Jackman.

The family members testified consistently with their trial testimony that petitioner was a kind and considerate person when not under the influence of drugs. Petitioner's siblings also testified, consistent with the social history recited by Professor Reece, about the chaotic family life brought about by the volatile nature of the relationship between their parents, the alleged

physical and psychological abuse of petitioner and his siblings by their parents, and the family's peripatetic existence. On cross-examination, however, the siblings conceded that the instances of "physical abuse" by their mother that they had described occurred when the children were being punished for misbehavior. Their testimony suggested that, contrary to the evidence offered at the penalty phase, petitioner was not the only "bad seed" in an otherwise loving family. Several of his siblings had criminal records related to substance abuse. His father also had a criminal record. It also appeared, however, that the family was a loving family in which petitioner's older sisters, although they left the home to marry in their midteens in order to avoid the turmoil, returned home regularly on Sundays for family meals.

IV

*Referee's Report/Petitioner's Exceptions/Findings of This Court*

After an evidentiary hearing, Judge Moore filed her final report on November 17, 1994. Petitioner has filed exceptions to the report, and both petitioner and respondent have filed briefs on the merits.

■ In this proceeding, the referee's conclusions of law and resolution of mixed questions of law and fact are subject to independent review. The findings of fact are not binding on this court, but are given great weight if supported by substantial evidence since the referee has had the opportunity to observe the demeanor of the witnesses and the manner in which they testified. (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].)

The findings of Judge Moore in response to the court's questions are summarized below.

Question 1. Yes, Roger Agajanian interviewed most of petitioner's very large family, largely with the family as a whole, as his intention was to ensure consistency in their testimony. He asked them what the family was like. The information he obtained was that the family gave the appearance of being cohesive, concerned, supportive and close to each other. He did not uncover information that the family was dysfunctional. It was his decision to utilize the positive image of the family as mitigating penalty evidence by going forward with the defense of sympathy toward the family so the jury would conclude petitioner, as the one stray, was worth saving because the family was so good. Even had petitioner been abused by his family, counsel would not have introduced such evidence in an attempt to garner sympathy

for petitioner, since he consciously decided not to delve into those areas. He knew that once the jury heard about the senseless and heinous nature of the case and the stabbing of a pregnant woman, they would not care how terrible petitioner's childhood may have been. He wanted the jurors to focus on someone other than petitioner. He saw the positive appearance the family portrayed. Having seen other situations where jurors were lenient toward a defendant because they liked the defendant's family, he made the choice to focus on petitioner's family, believing the jury would reject any attempts to place petitioner in a sympathetic position.

Petitioner objects to the referee's finding that Agajanian interviewed members of the family. He claims, and the record supports the claim, that Agajanian did not conduct formal interviews with any members of petitioner's family other than petitioner. He met with some of them when he was retained and conversed with some of them at luncheon meetings during the trial. No matters of substance were discussed in those conversations. Petitioner's background and the family history were not discussed. Agajanian did not question any family members, individually or together, with the purpose of gathering evidence or information that might be used at the penalty phase of the trial.

We conclude that, while Agajanian did not "interview" members of petitioner's family as this court intended the word to be understood, he did speak with them and obtained information about the mitigating evidence that he subsequently elicited from the family members during the penalty phase of the trial.

Petitioner also objects that the referee's response goes beyond the question put by the court, erroneously states that at the time in question petitioner had been "convicted" of a heinous crime, and erroneously assumes that Agajanian was aware that evidence of the stabbing of Kathy Cusack would be presented at the time he elected to present only a family sympathy defense. These claims have merit. Agajanian made his penalty phase decision before the trial. He conceded at trial and in this proceeding that he did not know evidence of the Cusack stabbing was to be presented.

Question 2. No, trial counsel did not conduct any other investigation of penalty phase defenses or become aware of potentially mitigating evidence from any other source. He did not care what a social history of the family and petitioner demonstrated in that, because of the heinous nature of the crime and the lack of remorse demonstrated in police videos by petitioner, he had no intention of introducing any evidence in an attempt to draw sympathy to his client. Instead trial counsel chose to attempt to draw

sympathy to the family of defendant in an attempt to make it difficult for the jury to decide this family's one stray, its son and brother, should be executed.

Petitioner does not object to the referee's finding, which is supported by the evidence.

Question 3. Neither court-appointed expert (Dr. Kaushal K. Sharma and Dr. Seawright Anderson) viewed any postarrest videotapes. Trial counsel did review the formal written report of Dr. Anderson, and a letter of Dr. Sharma which stated that on the basis of a very limited interview with petitioner, Dr. Sharma was not able to detect any information which would suggest psychiatric impairment in the defendant for the purpose of a psychiatric legal defense. Counsel decided not to use either doctor based on those reports. Instead he hired Dr. Broussard, a licensed psychologist with whom he had worked in the past and with whom he was confident he could work. Counsel received and did not personally respond to the requests made by Dr. Sharma. Most likely counsel's office staff provided the police reports and other documents Dr. Sharma had requested in his letters of May 8 and May 31 to counsel.

Petitioner does not object to the finding that the experts did not view the videotapes. That finding is supported by the evidence. He points out, however, that the record establishes that the "other documents" eventually supplied to Dr. Sharma were limited to an arrest record and "rap sheet." They did not include any other background information about petitioner. We agree.

Question 4. The report of Dr. Anderson was submitted as an exhibit to the referee's report.

Petitioner does not object to this finding. Dr. Anderson's conclusions have been summarized above.

Question 5. No, counsel did not review any records or other material relevant to petitioner's history.

Petitioner does not object to this finding which is supported by the evidence.

Question 6. Yes, trial counsel's decision to forego presentation of evidence at the penalty phase was an informed and knowledgeable decision. Counsel was an experienced criminal trial attorney who used his knowledge, experience, professional instinct and intuition in making his decision.

■ Petitioner objects that this finding, which is a conclusion of law or resolution of a question of mixed fact and law, is not supported by the evidence. The term "informed and knowledgeable decision" has a specific meaning when used in assessing the adequacy of counsel in the representation of a defendant charged with a crime. ■ An attorney's exercise of discretion in making tactical decisions regarding trial strategy must be both reasonable and informed. An informed decision is one made on the basis of reasonable investigation. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) Although counsel has "wide latitude and discretion . . . that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and *founded upon reasonable investigation* and preparation." (*People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587], italics added; see also *In re Marquez, supra,* 1 Cal.4th 584, 606; *In re Fields* (1990) 51 Cal.3d 1063, 1069 [275 Cal.Rptr. 384, 800 P.2d 862]; *In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].) "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 690-691 [80 L.Ed.2d 674, 695, 104 S.Ct. 2052].)

■ The referee apparently concluded that Agajanian's decision that presentation of a "family sympathy" defense at the penalty phase was preferable to an attempt to offer mitigating evidence was reasonable and justified his failure to undertake any investigation. We need not decide here whether counsel representing a capital defendant must investigate all potential sources of mitigating evidence, including avenues of investigation which counsel has no reason to believe may be fruitful. We assume arguendo that, since Agajanian apparently was put on notice of possible family discord during petitioner's youth, his decision to present a "family sympathy" defense without investigation to determine the nature of the evidence that was available was not a decision that a competent attorney representing a capital defendant would make.

Question 7. No, trial counsel's penalty phase strategy was not affected in any way by the fee arrangement. Petitioner's father had fully paid by way of

cash, a $17,000 lien on a personal injury case of his daughter's friend, and some tile work done by the father at counsel's office. The lien proceeds never materialized. There is no indication that counsel withheld any services, investigation or use of experts because of the fee arrangement.

Petitioner objects to this finding on the ground that the delay in retaining Dr. Broussard was attributable to the failure of petitioner's father to respond to Agajanian's demands for money.

The record supports the findings of the referee. While the lien proceeds had not yet materialized and may never have done so, the fee had otherwise been paid. This court's question was in response to petitioner's allegation that counsel suffered from a conflict of interest engendered by the fee arrangement that made it impossible for him to offer evidence that the family was dysfunctional and that petitioner's parents had abused him. The fee arrangement had nothing to do with the retention of Dr. Broussard, and there is nothing in the record to suggest that when Agajanian elected the family sympathy strategy he had any reason to consider engaging another expert.

Petitioner also complains that the referee made other findings she was not asked to make, and did not make any recommendation regarding his entitlement to relief. Because this court has access to and has reviewed the entire record on appeal, and is therefore able to make an assessment of prejudice, the court did not request that a recommendation be made regarding relief. The findings of the referee are broader in some respects than the questions submitted by this court. Nonetheless, as petitioner recognizes, when this court appoints a referee to take evidence and make findings, the findings are not binding on this court, which will make an independent review of the evidence and of the referee's resolution of mixed questions of law and fact. Ultimately, therefore, the findings on which resolution of petitioner's claims depend, are made by this court. The possibly extraneous findings of the referee are irrelevant.

Petitioner also complains that the referee excluded evidence regarding State Bar proceedings which led to the suspension of trial counsel from practice, evidence petitioner asserts was relevant to counsel's credibility, and would have revealed a pattern of indifference and inattentiveness to the needs of his clients. Petitioner fails to identify how any material in those records is relevant to specific questions on which the referee was ordered to take evidence and make findings of fact, however. To the extent that there may be relevance to the ultimate question of whether counsel provided ineffective assistance in the murder prosecution, this court may take judicial notice of the records of this court in the State Bar proceedings (Evid. Code,

§§ 452, subds. (c) & (d), 453), and we have granted petitioner's request that we do so.[6]

Petitioner also complains that the referee prevented inquiry into the relationship between counsel and the trial judge, and into counsel's lack of knowledge of Judge Fitzgerald's past knowledge of petitioner and the judge's comments about accomplice Hefner. Petitioner argues that this inquiry would have exposed additional evidence of trial counsel's inadequate preparation for trial, including his failure to procure a transcript of the Hefner trial in order to review the testimony of the witnesses at that trial. We find no error or impropriety. Again, the evidence was not related to the specific questions put to the referee. Only disputed issues of fact whose resolution is necessary to disposition of the petition are the subject of the reference order. Counsel's failures in this regard are not disputed issues of fact.

Petitioner also objects to appendices to the referee's report in which she offers comments on some of the evidence, and asks that the comments be disregarded. To the extent that these comments offer insights into the referee's assessment of witness credibility, they may be considered, and we have done so where appropriate.

Respondent urges the court to adopt the findings and conclusions of the referee, noting that the referee concluded that petitioner's family was a paradox. It was dysfunctional, but was also close-knit. Respondent also

---

[6]Agajanian was first suspended for four years by a July 10, 1990, order in Bar. Misc. 5560. The order was stayed, probation granted, and an actual suspension of two years made a condition of probation. On October 16, 1991, an actual suspension of three years to be concurrent with the former suspension was ordered in a matter in which eight additional complaints relating to matters occurring between 1980 and 1989 were consolidated (see *In re Agajanian*, S022257), and a third suspension was ordered on June 17, 1993, on a finding that probation had been violated. Agajanian resigned from the bar, with additional disciplinary charges pending, on June 30, 1994.

During the time that Agajanian represented petitioner on appeal from this conviction, he filed a 30-page opening brief, purported to adopt the amicus curiae brief filed by counsel from the California Appellate Project, and filed no reply brief. While representing petitioner he was convicted of two counts of criminal contempt (18 U.S.C. § 401(3)) in the United States District Court for the District of Vermont in December 1985. That judgment was affirmed on appeal. (*U.S.* v. *Agajanian* (2d Cir. 1988) 852 F.2d 56.)

The bases for the disciplinary proceedings that followed the proceeding related to the contempt conviction were complaints that Agajanian had abandoned clients, failed to respond to client communications, made false representations and misrepresentations, lost files, and failed to perform promised services. Evidence was admitted at the evidentiary hearing that during the time he represented petitioner, Agajanian did not respond to client communications, failed to make court appearances, did not visit clients in jail or show up in court or other places as promised, and was distracted by a civil suit against a nonlawyer who shared his office and was accused of fraudulent sales of trust deeds.

notes that some of the testimony of petitioner's siblings was inconsistent. They did not all recall the same incidents. Moreover, some offered reasonable explanations for what otherwise appeared to be unreasonable or arbitrary infliction of physical and verbal abuse on the children.

The testimony of the family members was consistent in many respects and their description of chaotic family life is supported by the records compiled much earlier when petitioner was in Youth Authority custody. The experts who relied on those records as well as statements by the siblings concluded that their parents' verbal and physical abuse of the children, and of petitioner in particular, had a marked impact on him and contributed to his use of drugs. However, the evidence also showed that the family was close-knit in many ways—the children who had left the home returned for family dinners on some Sundays and holidays, they visited petitioner while he was in custody in youth and adult facilities, and all supported one another in times of need.

Moreover, as we discuss below, petitioner's effort to show that if the jury had been made aware that his family background led to his substance abuse and assaultive conduct while under the influence of drugs a different penalty verdict would have been reached is unpersuasive. It is so because the underlying assumption that petitioner committed the assault and murder because he was under the influence of drugs is not supported by either the record in the habeas corpus proceeding or the record on appeal.

V

*Relief on Habeas Corpus*

A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. (*People* v. *Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) To do so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. (*People* v. *Ledesma, supra*, 43 Cal.3d 171, 243.) When the basis of a challenge to the validity of a judgment is constitutionally ineffective assistance by trial counsel, the petitioner must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown (*United States* v. *Cronic* (1984) 466 U.S. 648, 658-659 [80 L.Ed.2d 657, 6677-668, 104 S.Ct. 2039]; *In re Avena* (1996) 12 Cal.4th 694, 726-727 [49 Cal.Rptr.2d 413, 909 P.2d 1017]);

or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698]; *In re Avena, supra,* 12 Cal.4th at p. 721; *In re Alvernaz* (1992) 2 Cal.4th 924, 936 [8 Cal.Rptr.2d 713, 830 P.2d 747].) ■ In demonstrating prejudice, however, the petitioner must establish that as a result of counsel's failures the trial was unreliable or fundamentally unfair. (*In re Avena, supra,* 12 Cal.4th at p. 721.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693].)

The question we must answer is whether there is a reasonable probability that, but for counsel's errors and omissions, the sentencing authority would have found that the balance of aggravating and mitigating factors did not warrant imposition of the death penalty. (466 U.S. at p. 696 [80 L.Ed.2d at p. 699].) While the court must often be deferential to a tactical decision made by criminal defense counsel in order to avoid chilling vigorous advocacy and to avoid second-guessing counsel, we may not abdicate our role in assessing competence.

■ It is not true, as petitioner asserts, that Agajanian elected the penalty phase strategy of seeking sympathy for petitioner's family without doing any investigation whatsoever. His examination of the family members who testified at the penalty phase of the trial confirms that he had learned from them before they testified some information regarding petitioner's acts of kindness and generosity and his artistic skill. And, although he described his penalty phase theory as an attempt to elicit sympathy for the family, mitigating evidence was presented through their testimony. Nonetheless, as indicated earlier, we will assume arguendo that counsel's performance in this regard fell below the objective standard of reasonableness under prevailing professional norms demanded as an essential aspect of a criminal defendant's Sixth Amendment right to competent representation.

Notwithstanding Agajanian's multiple failings, however, this is not a case in which there was a total breakdown of the adversarial process within the meaning of *United States* v. *Cronic, supra,* 466 U.S. 648. The failure of counsel to present the mitigating evidence petitioner has now identified, or any specific type of mitigating evidence, does not reflect such a breakdown of the adversarial process as to render the verdict presumptively unreliable.

(*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1152 [245 Cal.Rptr. 635, 751 P.2d 901].) █ And, as we explained in *In re Avena, supra,* 12 Cal.4th at page 727, notwithstanding the broad language in the *Cronic* opinion (*supra,* 466 U.S. at p. 659 [80 L.Ed.2d at p. 668]) to the effect that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," the right to competent counsel has been denied and the result of the trial is presumptively unreliable, the actual application of *Cronic* has been much more limited. Defendants have been relieved of the obligation to show prejudice only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage. Neither factor is present here. In other circumstances, the petitioner must show how specific errors undermined the reliability of the verdict. (*United States* v. *Cronic, supra,* 466 U.S. 648; *In re Avena, supra,* 12 Cal.4th 694.) █ Therefore, while petitioner argues that he is entitled to relief without a showing of prejudice, we conclude that he must satisfy the standards established in *Strickland* v. *Washington, supra,* 466 U.S. 668.

As noted earlier, we will assume arguendo that Agajanian failed to afford constitutionally adequate representation because he allegedly: (1) failed to investigate and discover mitigating evidence as a result of his ignorance of the types of evidence a jury might consider mitigating; (2) failed to present readily available evidence that would have revealed to the jury the extent to which petitioner was subjected to psychological and physical abuse as a child, the impact the dysfunctional and peripatetic family life had on petitioner's development, and the correlation between these events and petitioner's resort to drugs; (3) failed to prepare, which left him unaware of the scope of the aggravating evidence to be introduced; and (4) delivered an unfocussed closing argument, during which he undercut his client's own case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating, prejudiced petitioner at the penalty phase of the trial.

Is it reasonably probable that the jury would have reached a more favorable penalty phase verdict had Agajanian represented him with greater competence? Petitioner argues that it is, and that without knowledge of petitioner's background the jury was not able to understand and assess his true character and thus could not truly assess his moral culpability. Respondent argues that petitioner has failed to prove prejudice.

In *In re Fields, supra,* 51 Cal.3d at pages 1078-1079, we addressed the process by which the court assesses prejudice at the penalty phase of a capital trial at which counsel was, allegedly, incompetent in failing to

present mitigating evidence: "What kind of evidentiary showing will undermine confidence in the outcome of a penalty trial that has resulted in a death verdict? *Strickland* [v. *Washington*], *supra*, 466 U.S. 668, and the cases it cites offer some guidance. *United States* v. *Agurs* (1976) 427 U.S. 97 [49 L.Ed.2d 342, 96 S.Ct. 2392], the first case cited by *Strickland*, spoke of evidence which raised a reasonable doubt, although not necessarily of such character as to create a substantial likelihood of acquittal. (See p. 113, fn. 22 [49 L.Ed.2d at p. 355].) *United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858, 873 [73 L.Ed.2d 1193, 1206-1207, 102 S.Ct. 3440], the second case cited by *Strickland*, referred to evidence which is 'material and favorable . . . in ways not merely cumulative . . . .' In *Strickland* itself the majority found trial counsel's failure to investigate additional mitigating evidence nonprejudicial, citing the weight of the aggravating evidence and the fact that the essence of the mitigating evidence had already been presented to the trier of fact through defendant's own words."

Here, as we have noted, some mitigating evidence was presented in the testimony of petitioner's family members who made the jury aware of the positive aspects of petitioner's character. In addition, petitioner's expert, Dr. Broussard, had testified at the guilt phase that petitioner had a minimal brain injury of a type associated with impulse disorder and learning disorder, and that in his opinion petitioner was in a drug-induced psychotic state at the time of the offenses and was not completely aware of what he was doing during the robbery and murder. Under the court's instructions, that evidence might have been considered mitigating at the penalty phase even though petitioner's counsel stated in closing argument that because the jury had rejected the guilt phase diminished capacity defense, the evidence was not mitigating.[7]

---

[7]In reviewing the statutory factors relevant to the penalty decision, Agajanian argued: "And ladies and gentlemen, with respect to diminished capacity, when you ladies and gentlemen returned this verdict of first degree murder and found special circumstances, you indicated to all of us that you did not find diminished capacity.

"So if you did not find diminished capacity, how can I argue that as a factor of aggravation or mitigation. It just does not apply. It's not there.

"I think when you ladies and gentlemen found that—you basically found him guilty of first degree murder and special circumstances, you found that diminished capacity did not reduce the nature of the robbery to something less than a robbery, or the nature of the first degree murder to something less than first degree murder.

"So that's not a factor of mitigation or aggravation. It's just not there at all.

"The age of the defendant. I happen to consider 26 years of age a rather young age, especially to lock a man in a cage for the rest of his life.

"Accomplice, the indication here was that he was not an accomplice or that his participation was minor—exactly the opposite. He is, as the People said, the triggerman."

This argument was made notwithstanding counsel's knowledge that the defense of diminished capacity had been abolished, and there was substantial evidence, including petitioner's

Petitioner has not shown that Agajanian's failure to prepare to meet or counter the evidence about his assault on Kathy Cusack was prejudicial. He does not suggest that this evidence could have been rebutted. Our principal concern therefore lies in Agajanian's failure to present the additional mitigating evidence about petitioner's family background, the expert testimony about that background, and the expert opinion that petitioner's drug abuse and assaultive conduct while under the influence of drugs were a product of growing up in a dysfunctional family in which he suffered continual psychological abuse.

We conclude that this omission did not prejudice petitioner. It is not probable that had this evidence been presented a more favorable result would have resulted at the penalty phase. The aggravating factors were overwhelming. The circumstances of the crime—an execution of one and attempted execution of the other, victims of a preplanned robbery—and the earlier knifing of William Scofield and the pregnant Kathy Cusack as she lay in bed trying to protect her fetus, were devastating. We cannot conclude that it is probable that the jury would have found that the evidence of petitioner's troubled family background itself would have outweighed that aggravating evidence.

Whatever the merit of petitioner's theory that if the jury understood why he was a drug abuser that knowledge might mitigate a crime committed while under the influence of illegal drugs, petitioner failed to establish that the theory had any relevance here. Apart from his trial testimony that he was "a little bit loaded" and the opinion offered by Dr. Broussard at the guilt phase of the trial, there is simply no evidence that petitioner was so affected by drugs that he was not fully aware of what he was doing when he planned and carried out the robbery and murder of Timothy Dykstra and attempted murder of Michael Wolbert.

The contrary is true. Unlike Dr. Broussard, we have reviewed the videotape of petitioner's postarrest statement and his subsequent reenactment of the crime. There is no suggestion in the evidence before the jury that petitioner was so affected by drugs that he was unable to think clearly when the crimes were planned or at the time they were carried out. In his statement and reenactment, apart from self-serving attempts to minimize the extent of his own participation in the crimes, petitioner manifested a detailed recollection, not only of the planning stages of the crimes, but also of their

confession, that the robbery had been preplanned and that intent to rob existed, both of which would explain the jury's rejection of that defense at the guilty phase. Counsel failed to recognize that the jury could, nonetheless, consider the evidence of organic brain damage associated with lack of impulse control as mitigating.

commission. Indeed, he testified that he had a "pretty clear" recollection of the events.

Moreover, petitioner testified at trial that he had taken a quarter gram of cocaine before going to pick up his paycheck between 5 and 6 p.m. on the night of the murder and had taken some earlier on that day and on the prior day, but he offered no evidence at trial or in the habeas corpus hearing regarding the impact of the drug on his reasoning ability, except his testimony that the cocaine made him "more wired" and "more spaced out." Cocaine did not make him more alert, but it did make him more "hyperactive." He conceded that he knew exactly what was going on, however, and uncontradicted evidence at trial established that he had the reasoning ability to plan the means by which he and Hefner would lure their victims to Santiago Canyon Road, with petitioner selecting the location for the robbery in a fairly remote area where he had once been in a county youth camp. He and Hefner selected a place to leave Hefner's car to mislead the victims as to their actual residence. Petitioner apparently selected the site of the crime under the pretense of having to relieve himself.

Michael Wolbert, who was with petitioner from the time the group left Garden Grove until they reached Santiago Canyon, testified that petitioner was not under the influence of drugs. Wolbert testified that during the time he was with petitioner he saw no indication that petitioner was under the influence of anything. He had heard petitioner speak before and on that evening heard nothing different about his voice. He saw nothing different about the way petitioner walked from the times he had seen petitioner at work. There was nothing in petitioner's face or eyes that was different and nothing to make Wolbert believe petitioner was under the influence of either alcohol or any drug. Wolbert saw petitioner cock the gun each time before petitioner shot Wolbert. Petitioner's actions when he shot Dykstra and Wolbert were not, as petitioner claimed, a sudden, irrational and impulsive reaction to a command by Hefner to shoot the victims.

In short there is no persuasive evidence that these crimes were a product of petitioner's drug abuse. The mitigating evidence that petitioner claims should have been offered did not support that theory and was minimal in comparison with the aggravating evidence. Under the circumstances it is not probable that the jury would have found evidence that petitioner's childhood was troubled or that he turned to drugs as a means of escape from an unbearable family situation mitigating or sufficiently so that the evidence would have affected the jury determination that the aggravating factors outweighed the mitigating in this case. Petitioner has not established that Agajanian's conduct during the penalty phase of the trial "so undermined the

proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 686 [80 L.Ed.2d at p. 692].)

The order to show cause is discharged and the petition for writ of habeas corpus denied.

George, C. J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.**—I agree with the majority that the failure of petitioner's trial counsel to present certain mitigating evidence at the penalty phase of petitioner's capital trial did not prejudice petitioner, and that therefore petitioner is not entitled to habeas corpus relief. I write separately to point out certain findings that were made by the referee at the evidentiary hearing and that, in my view, are of particular importance on the question of prejudice.

I find the issue of prejudice to be quite close. After a thorough review of all of the referee's findings and the supporting evidence, however, I am persuaded that petitioner suffered no prejudice from his trial counsel's failings. A referee's factual findings, although not binding on this court, "are given great weight when supported by substantial evidence," because only the referee "had the opportunity to observe the demeanor of witnesses" in order to assess their credibility. (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]; accord, *In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].) What I consider to be the most pertinent of the referee's findings will appear in the course of the discussion below.

After luring Timothy Dykstra and Michael Wolbert to a remote area of Orange County, petitioner and a cohort robbed them, and petitioner shot them both at close range. Dykstra died, Wolbert survived. Following a jury trial, petitioner was found guilty of the first degree murder of Dykstra, the attempted murder of Wolbert, and the robbery of both. The jury also found the existence of the special circumstance of robbery murder, and it returned a verdict of death. On petitioner's automatic appeal, this court affirmed the death judgment. (*People* v. *Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388].) In this proceeding, petitioner seeks a writ of habeas corpus in this court, asserting ineffective assistance of trial counsel.

Petitioner faults his attorney for not presenting at the penalty phase of the capital trial mitigating evidence of family violence and dysfunction. We ordered an evidentiary hearing on this issue.

After hearing testimony of various witnesses, the referee, Superior Court Judge Eileen C. Moore, found the evidence of family dysfunction to be in conflict. For instance, although some of petitioner's siblings testified at the reference hearing that their parents inflicted physical abuse on each other, and yelled and screamed at each other throughout a long marriage, there was also testimony by family members that the family was warm, loving, and supportive. As to evidence that the family moved between 12 and 18 times during petitioner's childhood, that was countered by evidence that the family displayed many characteristics of stability: the children raised pets, went on family outings and camping trips, learned to play musical instruments, and lived in a clean home where the family regularly had dinner together. With respect to testimony that some of petitioner's sisters had married in their teens to escape family conflict, there was also testimony that these same sisters would come to the family home to have Sunday dinner and to celebrate birthdays and holidays, and that they would often telephone home.

The referee also found discrepancies in the evidence presented at the reference hearing regarding claims of parental physical abuse of the children, the extent and seriousness of such abuse, and whether petitioner was singled out for such abuse. And with respect to opinions testified to by defense expert witnesses psychiatrist Jay Jackman and social worker Shirley Reece (for instance, that a birth defect corrected before petitioner reached school age had "a colossal and devastating effect" on his self-image, and that petitioner's home environment had caused petitioner's drug use), the referee found their opinions unsupported by the evidence and therefore lacking in "a certain amount" of credibility.

A petitioner seeking habeas corpus relief for ineffective assistance of trial counsel must establish not only that counsel's performance "fell below an objective standard of reasonableness," but also that the claimed deficiencies had a prejudicial effect on the outcome of the trial. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 693, 697-698, 104 S.Ct. 2052].) Prejudice is shown only when it can be said that absent the shortcomings in trial counsel's performance there exists "a reasonable probability" that the outcome would have been different. (*Id.* at p. 694 [80 L.Ed.2d at p. 698].)

Here, because of the conflicting evidence on the issue of family dysfunction, as shown in the referee's findings, presentation of such evidence at the penalty phase of petitioner's capital trial would not have been particularly effective. I see no reasonable probability, given the deliberate and ruthless manner in which petitioner committed the murder, that the jury's verdict of death would have been different had trial counsel pursued the "dysfunctional family" approach instead of, as counsel did, presenting a case in mitigation

based on petitioner's relationship with his loving and supportive family, and asking the jury to spare petitioner's life in consideration of petitioner's family.[1]

**MOSK, J.**—I dissent.

I continue to adhere to the view that I set out in dissent in *People* v. *Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388], and therefore reiterate it here.

At petitioner's capital trial, at both guilt and penalty phases, his attorney Roger James Agajanian "provided [him] with ineffective assistance in violation of his rights under the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution.

"Agajanian's deficiencies as trial counsel were pervasive and serious. The point is established by the record. . . . Examples of Agajanian's failings are hard to select, each competing with the rest for egregiousness. By way of illustration only, I note the following. At the guilt phase, Agajanian relied on the defense of diminished capacity. Much to the surprise he expressed at trial, this defense had previously been abolished and rendered a nullity for all relevant purposes. At the penalty phase, Agajanian presented a summation asking the jury to spare [petitioner's] life. The argument he made in support was worthless. . . .

"Agajanian's deficiencies at trial compel this conclusion: his failings resulted in a breakdown of the adversarial process . . . ; that breakdown establishes a violation of [petitioner's] federal and state constitutional right to the effective assistance of counsel; and that violation mandates [vacation] of the judgment even in the absence of a showing of specific prejudice. (See *United States* v. *Cronic* (1984) 466 U.S. 648, 653-662 [80 L.Ed.2d 657, 664-670, 104 S.Ct. 2039] [speaking of the federal constitutional guaranty only]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 242-245 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Grodin, J.) [speaking of both the federal and state constitutional guaranties].)

---

[1]To counter the prosecution's penalty phase case, petitioner's trial counsel presented mitigating evidence of petitioner's loving relationship with his family (Pen. Code, § 190.3, factor (k)) in an effort to persuade the jury not to condemn petitioner to death and, through argument, counsel tried to diminish the significance of aggravating evidence of petitioner's felony convictions and prior acts of violence. I therefore do not share the view of Justices Mosk and Brown that trial counsel failed to subject the prosecution's penalty phase case to "meaningful adversarial testing," which would warrant reversal under *United States* v. *Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 668, 104 S.Ct. 2039] for ineffective assistance of counsel without a need by petitioner to show prejudice.

'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' (*Herring* v. *New York* (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593, 600, 95 S.Ct. 2550]; accord, *United States* v. *Cronic, supra,* 466 U.S. at p. 655 [80 L.Ed.2d at p. 665].) In other words, 'The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.' (*Polk County* v. *Dodson* (1981) 454 U.S. 312, 318 [70 L.Ed.2d 509, 516, 102 S.Ct. 445].) It follows that the system requires 'meaningful adversarial testing.' (*United States* v. *Cronic, supra,* 466 U.S. at p. 656 [80 L.Ed.2d at p. 666].) 'When' —as here—'such testing is absent, the process breaks down and hence its result must be deemed unreliable as a matter of law.' (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1237 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. & dis. opn. of Mosk, J.); see *United States* v. *Cronic, supra,* 466 U.S. at p. 659 [80 L.Ed.2d at p. 668]; see also *Rose* v. *Clark* (1986) 478 U.S. 570, 577-578 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101] [to similar effect].)" (*People* v. *Visciotti, supra,* 2 Cal.4th at pp. 84-85 (dis. opn. of Mosk, J.), fns. omitted.)

In attempting to justify their refusal to set aside the sentence of death— they do not explain their salvaging of the other parts of the judgment—the majority simply assert that Agajanian did *not* provide petitioner with ineffective assistance.

Insofar as it is the law that stands in their way, the majority choose to renounce its substance.

Thus it is with ineffective assistance of counsel under a theory of constructive denial of representation.

The majority follow *In re Avena* (1996) 12 Cal.4th 694 [49 Cal.Rptr.2d 413, 909 P.2d 1017], over *United States* v. *Cronic* (1984) 466 U.S. 648 [80 L.Ed.2d 657, 104 S.Ct. 2039]. *Avena* tried to deconstruct *Cronic,* but did not, and could not, succeed. (See *In re Avena, supra,* 12 Cal.4th at pp. 775-782 (dis. opn. of Mosk, J.).) Notwithstanding *Avena*'s sophistry, *Cronic* declares that "[t]he right to the effective assistance of counsel" under the Sixth Amendment is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (*United States* v. *Cronic, supra,* 466 U.S. at pp. 656-657 [80 L.Ed.2d at p. 666], fns. omitted.) It follows that, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of

Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*Id.* at p. 659 [80 L.Ed.2d at p. 668].) In such a situation, "[n]o specific showing of prejudice [is] required . . . ." (*Ibid.*)

Insofar as it is the facts that stand in their way, the majority try to deny their force.

Thus it is with ineffective assistance of counsel under a theory of incompetent representation.

Such a theory, of course, entails deficient performance by counsel under an objective standard of professional reasonableness. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052] [under U.S. Const., Amend. VI only]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839] [under both U.S. Const., Amend. VI, and Cal. Const., art. I, § 15].) It also entails prejudice arising from counsel's deficient performance under a test of reasonable probability of a more favorable outcome. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 687, 693-694 [80 L.Ed.2d at pp. 693, 697] [under U.S. Const., Amend. VI only]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 217-218 [under both U.S. Const., Amend. VI, and Cal. Const., art. I, § 15].) But, one must hasten to add, a "reasonable probability" is not a "more likely than not" probability, but simply "a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 693, 694 [80 L.Ed.2d at p. 697] [under U.S. Const., Amend. VI only]; see *People* v. *Ledesma, supra,* 43 Cal.3d at p. 218 [under both U.S. Const., Amend. VI, and Cal. Const., art. I, § 15].)

The majority do not seriously dispute that Agajanian's performance—or better, nonperformance—at the penalty phase was deficient. Nor could they. *Res ipsa loquitur.*

Instead, the majority claim that from Agajanian's deficient performance at the penalty phase no prejudice arose. The mitigating evidence of petitioner's background and character, which was readily available but was not introduced at trial, was extensive and of substantial weight. The majority assert that this evidence would not have justified or excused his crimes. Obviously not. Even petitioner himself concedes the point. The fact remains, this evidence would have humanized him and hence would have helped explain how he was led to commit his crimes—and might well have gained him life imprisonment without possibility of parole instead of death. I do not overlook the aggravating evidence. Not at all. But I recognize, as the majority refuse to, that even substantial aggravating evidence does not compel the

ultimate sanction. (See, e.g., *People* v. *Von Villas* (1992) 11 Cal.App.4th 175 [15 Cal.Rptr.2d 112] [life imprisonment without possibility of parole for each of two police officers who conspired to commit, and did commit, a murder for hire]; *People* v. *Scott* (1991) 229 Cal.App.3d 707 [280 Cal.Rptr. 274] [life imprisonment without possibility of parole for a defendant who, with others, developed and carried out a plan to rob the residents of a house and leave no witnesses, resulting in four murders]; *People* v. *Talamantez* (1985) 169 Cal.App.3d 443 [215 Cal.Rptr. 542] [life imprisonment without possibility of parole for a defendant with several prior felony convictions who went "nigger hunting" and proceeded to kidnap, torture, and murder an African-American victim].)

For the reasons stated above,[1] I would vacate the judgment in its entirety.

**BROWN, J.**—I respectfully dissent.

Relying on this court's recent decision in *In re Avena* (1996) 12 Cal.4th 694, 726-728 [49 Cal.Rptr.2d 413, 909 P.2d 1017], the majority concludes that notwithstanding the "multiple failings" of petitioner's trial counsel, Roger Agajanian, this is not a case in which there was a total breakdown of the adversary process within the meaning of *United States* v. *Cronic* (1984) 466 U.S. 648 [80 L.Ed.2d 657, 104 S.Ct. 2039] (hereafter *Cronic*). (Maj. opn., *ante*, at pp. 352-353.) According to the majority, "[d]efendants have been relieved of the obligation to show prejudice only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage." (*Id.* at p. 353.) In my view, this reading of *Cronic* is inconsistent with both the express language of the high court's opinion and the application of that opinion by other courts.

In *Cronic*, the United States Supreme Court observed that although courts ordinarily "presume that the lawyer is competent to provide the guiding hand that the defendant needs, . . . [t]here are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." (*Cronic, supra*, 466 U.S. at p. 658 [80 L.Ed.2d at p. 667].) The court offered examples of *two* such circumstances. The first circumstance was "the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." (*Id.* at p. 659 [80 L.Ed.2d at p. 668], fn. omitted.) In a footnote elaborating on this first circumstance, the court noted that it had "uniformly found constitutional

---

[1]Which I am confident the United States District Court for the Central District of California will find persuasive when it considers petitioner's soon-to-be-filed petition for writ of habeas corpus.

error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding. [Citations.]" (*Id.* at p. 659, fn. 25 [80 L.Ed.2d at p. 668].) The court then identified a second circumstance in which a showing of prejudice is not required, stating that "[s]imilarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*Id.* at p. 659 [80 L.Ed.2d at p. 668].) It is apparent from even a cursory reading of *Cronic* that the footnote the majority now seizes on to limit the *Cronic* holding has nothing whatsoever to do with the circumstance in which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . ." (*Ibid.*) Nor has "the actual application of *Cronic* been much more limited." (Maj. opn., *ante*, at p. 353; see generally, *In re Avena, supra*, 12 Cal.4th at pp. 777-782 (dis. opn. of Mosk, J.) [federal and state cases applying *Cronic*].) As Justice Mosk previously recognized, "[t]he devil may often be in the details, but the rule of *Cronic* is not in its footnotes." (*Id.* at p. 776 (dis. opn. of Mosk, J.).)

The rationale for requiring reversal when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" (*Cronic, supra*, 466 U.S. at p. 659 [80 L.Ed.2d at p. 668]) is one of institutional integrity. " '[T]ruth,' Lord Eldon said, 'is best discovered by powerful statements on both sides of the question.' This dictum describes the unique strength of our system of criminal justice. 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' *Herring* v. *New York*, 422 U.S. 853, 862 [45 L.Ed.2d 593, 600, 95 S.Ct. 2550] (1975). It is that 'very premise' that underlies and gives meaning to the Sixth Amendment. It 'is meant to assure fairness in the adversary criminal process.' *United States* v. *Morrison*, 449 U.S. 361, 364 [66 L.Ed.2d 564, 567-568, 101 S.Ct. 665] (1981). Unless the accused receives the effective assistance of counsel, 'a serious risk of injustice infects the trial itself.' *Cuyler* v. *Sullivan*, 446 U.S. [335,] 343 [(1980) (64 L.Ed.2d 333, 343, 100 S.Ct. 1708)]. [¶] Thus, the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' *Anders* v. *California*, 386 U.S. 738, 743 [18 L.Ed.2d 493, 497-498, 87 S.Ct. 1396] (1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has

written: 'While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.' *United States ex rel. Williams* v. *Twomey,* 510 F.2d 634, 640 (CA7), cert. denied *sub nom. Sielaff* v. *Williams,* 423 U.S. 876 (1975) [46 L.Ed.2d 109, 96 S.Ct. 148]." (*Cronic, supra,* at pp. 655-657 [80 L.Ed.2d at pp. 665-667], fns. omitted.)

The penalty phase proceedings against petitioner, the subject of this court's order to show cause, are a textbook example of a process gone awry. Simply put, Agajanian failed petitioner at *every* stage of the proceedings. I offer several of many, many examples that could be given.

During his pretrial preparation, Agajanian "did not send for the police report [of the Cusack incident] or go through the prosecutor's file to read it in advance of trial and thus was surprised and unprepared to face that [aggravating] evidence." (Maj. opn., *ante,* at p. 340.) Likewise, he "failed to investigate and discover mitigating evidence as a result of his ignorance of the types of evidence a jury might consider mitigating." (*Id.* at p. 353.)

During the penalty phase of the trial itself, Agajanian "failed to present readily available evidence that would have revealed to the jury the extent to which petitioner was subjected to psychological and physical abuse as a child, the impact the dysfunctional and peripatetic family life had on petitioner's development, and the correlation between these events and petitioner's resort to drugs." (Maj. opn., *ante,* at p. 353.) Also during the penalty phase of the trial, Agajanian "delivered an unfocussed closing argument, during which he undercut his client's own case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating." (*Ibid.*)

During the direct appeal, "the sole act of any significance that [Agajanian] performed on behalf of [petitioner] over the course of almost seven years of representation before this court was the filing of a single thirty-page brief raising only two insubstantial penalty claims." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 84, fn. 2 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.); see also maj. opn., *ante,* at p. 350, fn. 6.) Thankfully, at this stage, Agajanian was suspended from the practice of law; not surprisingly, this case had not been his only misstep. (*Ibid.*)

Even after Agajanian was replaced by new counsel, however, he continued to fail petitioner. During the evidentiary hearing on this petition, Agajanian was less than candid regarding his decision to rely on a family sympathy defense. (See maj. opn., *ante,* at pp. 336-337, fn. omitted ["[I]n

none of his self-described successful presentations of a family sympathy defense in prior cases was family sympathy evidence relevant to any issue in the case and in none could the effort be accurately described as 'successful.'"]; *id.* at p. 337 ["Agajanian testified that he had no information about petitioner's family when he made his decision on penalty phase tactics. That testimony was contradicted by his expert, Dr. Louis Broussard, who testified that Agajanian told him that there was some 'brutality' in the family."].)

In the context of the penalty phase of the trial, it is clear that Agajanian "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." (*Cronic, supra,* 466 U.S. at p. 659 [80 L.Ed.2d at p. 668].) This court had it all wrong when, on direct appeal, it characterized Agajanian's penalty phase closing argument as "a rambling discourse, not tied to particular evidence." (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 82, fn. 45.) In fact, during the course of the so-called "rambling discourse," Agajanian systematically conceded nine of the eleven aggravating and mitigating factors set forth in Penal Code section 190.3 (section 190.3) to the prosecution.

Agajanian conceded "[t]he facts and circumstances of the case in my opinion do not have to be reviewed. [¶] There is no way to make light of those [video]tapes of things just like there's no way to make light of any kind of murder, whether or not there's a robbery involved . . . ." (See § 190.3, factor (a).) He conceded "past violence" was a factor in aggravation. (See § 190.3, factor (b).) He conceded "[w]ith respect to the prior conviction for assault with a deadly weapon, there's no way to make light of that either." (See § 190.3, factor (c).) He conceded "[w]ith respect to emotional disturbance, there's no evidence of that. That isn't even a factor to be considered." (See § 190.3, factor (d).) He conceded "[w]ith respect to the next one . . . victim participated or consented. That's not applicable. There's no evidence of that." (See § 190.3, factor (e).) He conceded "same situation" with respect to justification. (See § 190.3, factor (f).) He conceded "[e]xtreme duress, there was no evidence of that either. Although defense lawyers would like to have that present, it's not fair." (See § 190.3, factor (g).) He conceded "with respect to diminished capacity, when you ladies and gentlemen returned this verdict of first degree murder and found special circumstances, you indicated to all of us that you did not find diminished capacity. [¶] So if you did not find diminished capacity, how can I argue that as a factor of aggravation or mitigation? It just does not apply. It's not there."[1] (See § 190.3, factor (h).) And he conceded "the indication here was that [petitioner] was not an accomplice or that his participation was minor— exactly the opposite. [Petitioner] is, as the People said, the trigger man." (See § 190.3, factor (j).)

---

[1]During the guilt phase of the trial, Agajanian had erroneously attempted to rely on diminished capacity, which had been abolished as a guilt phase defense over a year earlier in a widely publicized initiative measure. (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 56 & fn. 23.)

Certainly, as the majority states, "[t]he aggravating factors were overwhelming" and the mitigating factors were "minimal in comparison." (Maj. opn., *ante*, at pp. 355, 356.) Even in such a case, though, counsel must hold the prosecution to its heavy burden. (*Cronic, supra,* 466 U.S. at pp. 656-657, fn. 19 [80 L.Ed.2d at p. 666].) Agajanian did not rise to the occasion. Although his abortive attempts to construct a family sympathy defense exposed some of the mitigating evidence to the jury, Agajanian undermined its effectiveness by "conceding that the jury could find that all of the possibly aggravating factors were present, and none of the mitigating." (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 66, fn. 35.) Indeed, the referee specifically found, and the majority agrees, that Agajanian "had no intention of introducing any evidence in an attempt to draw sympathy to his client." (Maj. opn., *ante,* at p. 346.)

" '[W]ith respect to the process of sentencing from among that class [of defendants who have already been found eligible for the death penalty] those defendants who will actually be sentenced to death, "[w]hat is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime.["] [Citation.] It is not simply a finding of facts which resolves the penalty decision, " 'but . . . the jury's moral assessment of those facts as they reflect on whether the defendant should be put to death . . . .' " ' [Citation.] Consideration of statutory aggravating and mitigating factors as part of the jury's normative function of determining the appropriate punishment is, therefore, distinguishable from the factual determination made when the jury finds that a special circumstance allegation is true." (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 74.)

Agajanian's abysmal across-the-board performance rendered the penalty phase of the trial a complete and utter farce. Under these circumstances, this court can have no confidence that the jury was actually able to perform its normative function of determining the appropriate punishment. "[T]here has been a denial of Sixth Amendment rights that makes the adversary process itself *presumptively unreliable.*" (*Cronic, supra,* 466 U.S. at p. 659 [80 L.Ed.2d at p. 668], italics added.) Therefore, I would grant petitioner a new penalty phase trial without requiring a specific showing of prejudice.

Mosk, J., concurred.

Petitioner's application for a rehearing was denied January 28, 1997, and the opinion was modified to read as printed above. Mosk, J., and Brown, J., were of the opinion that the application should be granted.