Filed 6/8/17

# IN THE SUPREME COURT OF CALIFORNIA

In re STEVEN M. BELL                )
                                    )
        on Habeas Corpus.           )                    S151362
                                    )
_____)

Steven M. Bell, who is under sentence of death for the first degree robbery-murder of Joey Anderson, petitioned this court for writ of habeas corpus claiming, among other things, that a holdout juror in the penalty deliberations solicited her husband's advice regarding her vote and, based on that advice, switched her vote to a death sentence. We issued an order to show cause on this claim of juror misconduct and ordered an evidentiary hearing before a referee in the superior court. After hearing testimony, the referee found the alleged misconduct did not occur.

We conclude the referee's findings are supported by substantial evidence and entitled to this court's deference. Because no misconduct has been proven, we will discharge the order to show cause and, by separate order, deny Bell's petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Bell's trial for the killing of Joey Anderson was conducted in October through December of 1993 in San Diego County Superior Court. Petitioner was convicted of first degree murder with a robbery-murder special

circumstance (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17)) and, in March 1994, was sentenced to death for the crime.

We affirmed Bell's conviction and sentence in *People v. Bell* (2007) 40 Cal.4th 582. Our appellate opinion recites the facts of the crime, which are not pertinent to the jury misconduct claim at issue here. In very brief summary, petitioner fatally stabbed Joey, the 11-year-old son of petitioner's girlfriend, while stealing a television and boom box belonging to Joey and his mother; petitioner then sold the appliances to get money for crack cocaine.

In his habeas corpus petition filed in this court in 2009, petitioner claimed Juror M.H. committed misconduct during the deliberations on penalty by consulting with her husband over how she should vote. Support for the allegation came from the declaration of another juror, P.R. According to P.R.'s 2009 declaration, she and M.H. initially voted for a life sentence and eventually were the only holdouts against the majority, which voted for death. The declaration continues: "On the last day of deliberations, [M.H.] approached me in the hallway before we entered the jury room and confessed that she had broken down and spoken to her husband about her dilemma the night before, to see if he could help her out of her dilemma, and he advised her to change her vote." M.H. and P.R. both changed their votes to death.

The petition also included a declaration by M.H., who remembered little of the penalty phase deliberations. As to the allegation of misconduct, M.H. declared, "I do not recall if I voted for death at the beginning of deliberations, or not until the end of deliberations, and I do not recall telling [P.R.] on the day we reached our penalty verdict that I had spoken to my husband the night before and then decided to change my vote from life to death. Susan Lake [the investigator for petitioner's counsel] asked me about this specifically, and I told her that I do not recall speaking to my husband and [P.R.]."

We issued an order to show cause on this claim of jury misconduct and, after receiving the People's return and petitioner's traverse, ordered the San Diego County Superior Court to appoint a referee and conduct an evidentiary hearing on specified factual questions:

(1) Did Juror M.H. discuss the jury's deliberations, or any other aspect of the case, with her husband during her service as a juror?

(2) If so, when did the conversation(s) occur?

(3) What information or advice, if any, did M.H.'s husband give M.H.?

(4) Did M.H. tell Juror P.R. about a conversation between M.H. and her husband?

(5) If so, when and what did M.H. tell P.R. about that conversation?

At the evidentiary hearing in September 2015, P.R. first testified that "as I sit here now" she did not recall speaking with M.H. during the *Bell* deliberations about a conversation M.H. had with anybody else about the case. But in light of her 2009 declaration, which she had reviewed, she later recalled M.H. saying something to her, though her memory was not of the detailed conversation recounted in the declaration. As P.R. remembered it at the time of the hearing, as they were entering the jury room M.H. "kind of stage whispered" that " 'my husband helped me decide.' " P.R. described her memory as "confused" and was not sure whether M.H. spoke to her as they entered the jury room for further deliberations or as they entered the courtroom to return their verdict, though she thought it was the former.

P.R. also testified to some prior confusion about the circumstances under which a juror had been dismissed during trial. At the hearing, she recalled learning after the trial that this juror was dismissed for speaking to her husband

3

about the case.[1]  But in 2014 she had told an investigator for the Attorney General that the juror was dismissed because she did not want to be on the jury, rather than for misconduct.  At the time she made that statement, P.R. was unsure whether only one juror had been dismissed during trial or two, one for speaking to her husband and one because she did not want to be there.  However, P.R. denied confusing the dismissed juror with M.H.

A couple of months after the trial, P.R. spoke with Peter Liss, one of the defense attorneys at trial.  Although Liss asked generally about the jury's deliberations, and although P.R.'s memory of the trial was fresher at that time than in 2009, she did not tell Liss about M.H.'s remarks to her during penalty deliberations.  She had not yet "register[ed]" the conversation as important, though by the time of the hearing she knew it was and she should have told Liss about it.

M.H. testified that the trial judge in the *Bell* trial admonished the jurors not to discuss the case with others during the trial.  M.H. took the admonishment seriously; she recalled a younger woman juror was dismissed during the trial for discussing the case with her husband.  M.H. did not discuss the case with her husband until after the trial.  She did not ask for his advice during the deliberations and did not discuss the case with any other juror during the trial outside of deliberations.  She did not recall any such discussions happening and believed they did not occur, based on her knowledge of the admonition the court gave, her own personality (she described herself as an independent thinker who would not

---

[1]     As described in our appellate opinion, the trial court dismissed holdout Juror A.G. during guilt phase deliberations for misconduct in discussing the case and the deliberations with her husband.  (*People v. Bell*, *supra*, 40 Cal.4th at pp. 613–616.)

4

have relied on her husband in making the penalty decision) and her relationship with her husband: "He wouldn't have asked me and I wouldn't have told him."

M.H.'s husband, S.H., had served on two juries before his wife served in the *Bell* case and was admonished in both not to discuss the case outside of deliberations. He knew M.H. was not supposed to discuss the *Bell* case with him during the trial, and they did not do so. S.H. also explained that his wife talks a lot, that he is generally uninterested in what she says and does not himself like to talk, ask questions, or listen to her.

Susan Lake, the Habeas Corpus Resource Center investigator who interviewed P.R. in 2009 and prepared her declaration, testified to the process by which that declaration was produced. Lake did not tape-record her interviews with P.R., and her notes from their first interview on May 28, 2009, state only, with regard to P.R.'s account of M.H.'s statement to her, "last day confronted me—talked to husband." Lake drafted a declaration after the first interview, then met again with P.R. on June 1, 2009. She did not take notes of this follow-up meeting, but revised the draft on the basis of what P.R. said at the time; she could not testify as to what particular revisions were made. At a third meeting, Lake read the declaration to P.R., who asked for a few changes (which appear in handwriting on the declaration submitted in support of the petition) and signed the declaration.

The referee concluded there was "insufficient credible evidence to find M.H. spoke to her husband about the case during her service as a juror." Assessing M.H. as a "very coherent and responsive witness," the referee observed she was fairly consistent in her testimony that she would not have and did not talk to her husband about the case or ask him to help her decide on her verdict. Moreover, her testimony was supported by his: S.H. testified he had served on juries and knew jurors were not to discuss the case outside of deliberations, and

5

further testified he was uninterested in discussing the *Bell* case with M.H. From this testimony, the referee concluded "it is unlikely he would discuss the case with her or help her decide how to vote."

As to P.R.'s testimony, the referee did not think she was deliberately lying about what she recalled, but found her memory "questionable," observing she paused before and during her answers for long periods and had significant trouble following the questions. Given investigator Lake's failure to record her interviews with P.R. and Lake's "cryptic" notes, the referee was unconvinced P.R.'s 2009 declaration accurately recorded "what P.R. actually recalled independently in 2009." Although P.R. testified at the hearing that M.H. told her, "my husband helped me decide," P.R. did not mention this conversation to trial attorney Liss when she spoke to him shortly after the trial, "even though it appears she was aware that another juror was dismissed for speaking to her husband." Given these facts, the referee considered it possible P.R. was "confusing M.H. with the juror who was actually dismissed for speaking to her husband during trial."

Consistent with this assessment of the testimony, the referee found that any conversation between M.H. and her husband about the case occurred after the trial ended, that there was no evidence S.H. gave M.H. any advice about the case, and that there was insufficient credible evidence M.H. ever said to P.R., "my husband helped me decide."

## DISCUSSION

A petitioner for writ of habeas corpus collaterally attacking his conviction bears the burden "initially to *plead* sufficient grounds for relief, and then later to *prove* them." (*People v. Duvall* (1995) 9 Cal.4th 464, 474; accord, *In re Price* (2011) 51 Cal.4th 547, 559.) Before the writ may issue, the petitioner must prove the facts establishing a basis for relief by a preponderance of the evidence. (*In re Price, supra*, at p. 559; *In re Visciotti* (1996) 14 Cal.4th 325, 351.)

6

When, as here, this court has ordered an evidentiary hearing before a referee on one or more of the petitioner's claims, we independently review the referee's resolution of legal issues, and mixed questions of law and fact, but review deferentially the referee's factual findings, giving them great weight if they are supported by substantial evidence. (*In re Visciotti*, *supra*, 14 Cal.4th at p. 345.) "Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee's findings on factual questions. [Citation.] 'Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying.' " (*In re Price, supra*, 51 Cal.4th at p. 559.)

A criminal defendant's constitutional right to an impartial jury includes the guarantee of a jury that has not been subjected to improper influences, on which each member is capable and willing to decide the case solely on the evidence before the jury. (*In re Hamilton* (1999) 20 Cal.4th 273, 293; *People v. Nesler* (1997) 16 Cal.4th 561, 578.) A juror who violates his or her oath and the court's admonitions by consciously receiving outside information or discussing the case with nonjurors during trial commits misconduct. (*In re Hamilton*, *supra,* at p. 294.) Such misconduct raises a rebuttable presumption of prejudice. (*Id.* at p. 295.)

### I. Evidentiary Issues

Petitioner enters exceptions to the referee's evidentiary rulings excluding several of the witnesses' prior declarations and statements.

First, the referee ruled M.H.'s statement in her 2009 declaration that "I do not recall speaking to my husband" during deliberations was not admissible under

the hearsay exception for prior inconsistent statements (Evid. Code, § 1235) because it was not materially inconsistent with M.H.'s hearing testimony that she *did not* speak to her husband about the case at that time.

We agree with the referee's ruling. On the question of whether she spoke with her husband about the case during deliberations, M.H.'s hearing testimony was more definite than, but not fundamentally inconsistent with, her 2009 declaration. As the referee explained, M.H. testified, consistently with her declaration, that she did not recall any such conversation, and stated partly on that basis that no conversation occurred. She testified that her belief no conversation occurred was based on "my recollection, and who I am as a person. I don't think I would have done it." When asked about the difference between not recalling an event and stating that it did not happen, she answered, "If I don't recall it happening, it didn't happen. . . . Well, I feel that I don't recall it and I didn't do it based on my recall." Thus her testimony that she had no such conversation with her husband was not inconsistent with her earlier statement that she did not recall any such conversation; indeed, it was expressly based, in part, on her lack of such a recollection.

This is not a case in which the witness at trial purports to remember an event she previously stated she did not recall. Here, M.H. consistently stated she recalled no conversation with her husband about the case during trial. Her further testimony at the hearing that, partly because of this lack of recall, she believed the conversation did not occur did not create a conflict with her declaration.[2] Nor is it

---

[2]    Petitioner argues that in her 2009 declaration, unlike her hearing testimony, M.H. was "unable to affirm or deny" that the conversation happened. The declaration, however, does not include any statement that M.H. could not deny the conversation happened, and investigator Lake's testimony about the interview on which the declaration was based, to which petitioner cites, also fails to support the

*(footnote continued on next page)*

a case where the witness on the stand attempts to evade questioning by feigning lack of memory of events the witness previously described. (See *People v. Homick* (2012) 55 Cal.4th 816, 859–860.) While Evidence Code section 1235 does not require an express contradiction between the testimony and the prior statement, it does require inconsistency in effect (*People v. Homick*, *supra*, at p. 859); the referee correctly found no such inconsistency in this case.

Second, petitioner takes exception to the referee's ruling regarding a prior statement by M.H.'s husband, S.H. At one point in his hearing testimony, S.H. testified he did not discuss the "facts of the case" with his wife during or after the trial and knew only that it was a murder trial. Petitioner contends this statement is inconsistent with answers S.H. gave to an investigator from the Attorney General's office in 2014, and those answers should have been admitted as prior inconsistent statements under Evidence Code section 1235.

We agree with the referee, however, that S.H.'s 2014 answers were so vague as to avoid any inconsistency. He told the investigator in 2014 that "if" M.H. told him anything about "the trial" while it was going on he did not remember it, but that when it was over he learned "some small particulars about it." To another question about conversations during the trial, he answered he "may have heard something" but could not recall what. These responses, conditional and vague as to contents and source as they were, and referring in part to "the trial" rather than to "the facts of the case," do not amount to statements that

---

*(footnote continued from previous page)*

claim. Lake testified merely that it was clear to her M.H. "did not have a memory" of the conversation.

M.H. and S.H. discussed the facts of the case during or after the trial. (Of course, any discussion after trial would not itself be misconduct.)

Third, petitioner contends the referee erred in declining to consider P.R.'s account, in her 2009 declaration, of her interaction with M.H. Petitioner argues this account was admissible as past recollection recorded. (Evid. Code, § 1237.) To introduce a hearsay statement contained in a writing under that exception, however, the proponent must establish the writing was made "at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory." (*Id.*, subd. (a)(1).) We agree with the referee that petitioner did not establish the 2009 declaration was made at or near the time of the trial (1993) or that the event described there was fresh in P.R.'s memory at the time she made the declaration.

Petitioner cites our holding in *People v. Cowan* (2010) 50 Cal.4th 401, 466, that trial courts "have the flexibility to consider all pertinent circumstances in determining whether the matter was fresh in the witness's memory when the statement was made" and that a lapse of months or even a few years does not necessarily bar a finding the witness's memory was reasonably fresh. But even considering factors other than the lapse of time, as the referee did, the record shows only that P.R.'s memory of her interaction with M.H. was better in 2009 than it was at the 2015 evidentiary hearing, not that the events were then still fresh in P.R.'s mind. Because investigator Lake did not record her interviews with P.R., the record does not show what particular questions Lake asked P.R. that prompted her to recount her conversation with M.H. (a conversation P.R. did not report to defense attorney Liss when contacted shortly after the trial), or how those questions were asked; nor does it show whether in drafting the declaration Lake used exclusively P.R.'s words or included her own paraphrases of P.R.'s oral statements. Given the fallibility of memory, the fact that P.R. *believed* she could

10

recall the interaction with M.H. in some detail 16 years after it occurred does not demonstrate her memory was actually fresh at the time.

Petitioner argues the circumstances here are analogous to those in *People v. Cummings* (1993) 4 Cal.4th 1233, 1293, where we held a prior written statement was properly admitted under Evidence Code section 1237 despite the witness's testimony casting doubt on his ability to recall the events at the time he made the statement. In that case, however, the statement was made only a few days after the events it described. (*People v. Cummings*, *supra*, at p. 1293.) The lapse of 16 years that occurred in this case makes showing the witness's memory was fresh extremely difficult, if not impossible. Petitioner has not carried that burden.

In addition, petitioner contends the referee erred in excluding, under Evidence Code section 1150, P.R.'s testimony that before M.H. told P.R. her husband helped her decide on her verdict, "we knew we were both struggling." We agree with the referee. P.R.'s statement that she and M.H. were both struggling to reach a verdict falls within Evidence Code section 1150's bar on evidence "concerning the mental processes by which" the verdict was reached.

## II. Petitioner's Exceptions on the Merits

Petitioner contends the referee's findings are not supported by substantial evidence because the referee misjudged the credibility of the witnesses. The testimony of M.H. and S.H. "is dubious for several reasons," he argues, while P.R. "provided a credible account of her encounter with M.H. on the last day of penalty deliberations."

As to M.H., petitioner stresses that she could recall very few details about petitioner's 1993 trial, and her testimony that she did not discuss the case with her husband during trial was based on her lack of memory of such an event rather than on "an actual memory" of its nonoccurrence. But that M.H. remembered little

11

about her service as a juror more than 20 years earlier is not surprising or discrediting. Moreover, one typically does not have a specific memory of an event *not* happening. (The exception would be when the event was expected to occur in a particular time period but noticeably failed to do so.) Unless we *assume* M.H. talked to her husband about the case during the trial, which we cannot—petitioner's burden is to prove that fact—there is nothing discrediting in M.H.'s testimony that she did not recall any such conversation and, based on that lack of recall and other factors, did not believe it happened. Nothing petitioner cites in M.H.'s testimony gives us reason not to defer to the assessment of the referee, who heard the witness on the stand, that M.H. was a "very coherent and responsive witness" who testified fairly consistently that she "did not, and would not have" talked to her husband about the case during the trial.

As to S.H., petitioner argues his testimony that his wife talked a lot and he often did not listen to her undermines his testimony that they did not discuss the *Bell* case during trial. But S.H.'s acknowledgement that he might have ignored M.H. if she said anything about the trial does not detract from his material testimony that, having served twice as a juror, he was aware of the rule that jurors were not to discuss the case with others and therefore did not discuss the *Bell* case with M.H. during trial. The referee was entitled to rely on this testimony to corroborate M.H.'s testimony that no such discussion occurred.

Turning to P.R., petitioner argues she was the more believable witness on several grounds. First, where the referee found "significant trouble following questions" and "long pauses in her answers," petitioner characterizes P.R.'s demeanor on the stand as "that of a thoughtful, careful person" trying to honestly answer questions about her recollection of past events. We take petitioner's point that pauses in answering and requests for clarification of questions can be signs of caution as well as of confusion or lack of comprehension, but we decline to

12

substitute our evaluation of the witness's demeanor for that of the referee, who saw and heard the witness testify. The cold transcript simply does not allow us to overrule the referee's assessment that P.R.'s manner of testifying raised questions about the accuracy of her memory.

On the question of what P.R. actually remembered about the *Bell* penalty deliberations, petitioner attacks the referee's hypothesis that, in testifying that M.H. told her about a conversation with her husband, P.R. may have mistakenly attributed to M.H. misconduct for which she knew another juror (A.G.) had been dismissed. Contending this hypothesis is unsupported by the evidence, petitioner points out that P.R. was able to describe M.H.'s appearance and identify her in person and from a photograph and that her 2009 declaration clearly distinguished between M.H. and A.G. The referee's hypothesis, however, was not that P.R. confused the personal characteristics of M.H. and A.G. but that, when interviewed 16 years after the trial, she misremembered the misconduct she knew A.G. had engaged in with her husband as the subject of a conversation with M.H. concerning M.H. and *her* husband. This hypothesis is not implausible in light of the record.

As the referee observed, P.R. did not report any conversation about misconduct to defense counsel Liss when he interviewed her shortly after the trial, even though she testified (if somewhat equivocally) that she knew at the time A.G. had been discharged for exactly that misconduct—and therefore would have known of the seriousness of any conversation during trial between M.H. and her husband. P.R.'s explanations for this omission were vague and unconvincing: Liss did not ask, she did not realize until 2009 that the conversation was important, and she did not feel Liss was a "confidant" with whom she could share the information. Much later, P.R. told an investigator from the Attorney General's office she thought the dismissed juror simply wanted to be relieved from service,

13

not that she had committed misconduct. At the time she made that statement, P.R. testified, she was confused as to how many jurors had been dismissed during trial, one or two.

The record thus suggests P.R. may, when recalling the events of trial many years later, have conflated what she knew of A.G.'s misconduct with conversations she had with M.H., to whom she remembered "gravitat[ing]" during the trial because of their similar ages.

Petitioner further argues that P.R. had no reason to testify falsely about her interaction with M.H., while M.H. and S.H. were both motivated to cover up M.H.'s misconduct. But even without a motive for lying, P.R. could easily have been confused as to what, if anything, M.H. told her more than 20 years earlier about a conversation between M.H. and her husband. Faced with the task of reconciling P.R.'s testimony with that of M.H. and S.H., the referee chose to find P.R. was misremembering events rather than that M.H. and S.H. were deliberately testifying falsely. This conclusion rested heavily on the referee's positive assessment of M.H. and S.H.'s credibility as witnesses. Again, the cold transcript provides us with no sufficient ground to substitute our own credibility assessment for that of the referee.

### CONCLUSION AND DISPOSITION

The testimony of M.H. and S.H. provides substantial evidence to support the referee's conclusion the alleged jury misconduct did not occur. Giving great weight to the referee's factual findings based on her determination of witness credibility, we adopt those findings and, on that basis, conclude that petitioner has failed to prove by a preponderance of the evidence his claim that trial Juror M.H. committed misconduct by discussing the case with her husband during the period of the penalty deliberations.

Because our order to show cause and our reference order were limited to this claim, we do not here address any other claim set forth in the petition. The remaining claims will be resolved by a separately filed order.

The order to show cause is discharged.

**WERDEGAR, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Bell
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S151362
**Date Filed:** June 8, 2017
_____

**Court:** Superior
**County:** San Diego
**Judge:** Richard Murphy and Joan P. Weber

_____

**Counsel:**

Habeas Corpus Resource Center, Miro F. Cizin, Kevin Bringuel, Eileen Connor, Anne D. Gordon and Paula Fog for Petitioner Steven M. Bell.

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Holly D. Wilkens, Michael T. Murphy and Lynne G. McGinnis, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Miro F. Cizin
Habeas Corpus Resource Center
303 Second Street, Suite 400 South
San Francisco, CA  94107
(415) 348-3800

Lynne G. McGinnis
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9217